No. 23-10019

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JAMES EARL TALLEY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
the Honorable Susan Illston, Presiding.
No. 22-cr-00028-SI

## APPELLANT'S OPENING BRIEF

JODI LINKER
Federal Public Defender
Northern District of California
TODD M. BORDEN
DANIEL P. BLANK
Assistant Federal Public Defenders
450 Golden Gate Avenue, 19th Floor
San Francisco, California 94102
(415) 436-7700

*Counsel for Defendant-Appellant*
JAMES EARL TALLEY

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... III

JURISDICTION AND BAIL STATUS ................................. 1

ISSUE PRESENTED ......................................................... 1

STATEMENT OF THE CASE.............................................. 1

    I.    AN ANONYMOUS 911 CALLER REPORTED A WHITE LATINO MAN WITH A GUN ON THE SECOND FLOOR OF THE CIVIC CENTER INN. ...... 1

    II.    SFPD OFFICERS RESPONDED TO THE MOTEL. THEY SEARCHED TALLEY, A BLACK MAN, IN THE REAR GROUND-LEVEL PARKING LOT.  4

    III.    TALLEY WAS CHARGED WITH BEING A FELON IN POSSESSION OF A FIREARM, AND MOVED TO SUPPRESS EVIDENCE OBTAINED FROM THE OFFICERS' WARRANTLESS SEARCH OF HIS PERSON. .................... 13

    IV.    THE DISTRICT COURT INITIALLY DENIED THE MOTION TO SUPPRESS, BUT SUA SPONTE VACATED ITS ORDER TO HOLD AN EVIDENTIARY HEARING. ......................................................... 13

    V.    THE DISTRICT COURT CONDUCTED AN EVIDENTIARY HEARING. 15

    VI.    THE DISTRICT COURT AGAIN DENIED TALLEY'S MOTION TO SUPPRESS. ................................................................ 18

    VII.    TALLEY ENTERED A CONDITIONAL GUILTY PLEA, PRESERVING HIS RIGHT TO APPEAL THE DENIAL OF HIS SUPPRESSION MOTION, AND RECEIVED A TIME-SERVED SENTENCE................................... 20

SUMMARY OF ARGUMENT............................................ 21

ARGUMENT................................................................ 23

    I.    THE DISTRICT COURT ERRED IN DENYING TALLEY'S MOTION TO SUPPRESS BECAUSE THE OFFICERS LACKED REASONABLE SUSPICION TO SEIZE AND FRISK TALLEY. ........................................... 23

        A.  Standard of review .................................................. 23

        B.  The officer's warrantless seizure and search of Talley was presumptively unreasonable. ................................. 23

C.  The tip from an anonymous 911 caller without first-hand information lacked sufficient indicia of reliability to provide reasonable suspicion to seize or frisk anyone. ...................... 25

D.  The officers lacked reasonable suspicion to search Talley, an African-American man on the ground level, who did not match the suspect described by dispatch as a white male Latino on the second floor ......................................................... 38

**CONCLUSION** ........................................................................... **44**

# TABLE OF AUTHORITIES

## Federal Cases

*Alabama v. White,*
    496 U.S. 325 (1990) ................................................................ 25, 31, 32

*California v. Hodari D.,*
    499 U.S. 621 (1991) ............................................................................ 24

*Dancy v. McGinley,*
    843 F.3d 93 (2d Cir. 2016) ................................................................ 42

*Florida v. Bostick,*
    501 U.S. 429 (1991) ............................................................................ 23

*Florida v. J.L.,*
    529 U.S. 266 (2000) ................................................................... *passim*

*Foster v. City of Indio,*
    908 F.3d 1204 (9th Cir. 2018) .................................................... 32, 33

*Goodson v. Corpus Christi,*
    202 F.3d 730 (5th Cir. 2000) ............................................................ 41

*Maryland v. Buie,*
    494 U.S. 325 (1990) ............................................................................ 38

*Navarette v. California,*
    572 U.S. 393 (2014) ...................................................................... 25, 33

*Terry v. Ohio,*
    392 U.S. 1 (1968) ................................................................... 25, 26, 38

*Thomas v. Dillard,*
    818 F.3d 864 (9th Cir. 2016) ................................................. 38, 39, 41

*United States v. Bautista,*
  684 F.2d 1286 (9th Cir. 1982) ........................................................ 42

*United States v. Brown,*
  925 F.3d 1150 (9th Cir. 2019) ....................................................... 18

*United States v. Cortez,*
  449 U.S. 411 (1981) ....................................................................... 25

*United States v. Edwards,*
  761 F.3d 977 (9th Cir. 2014) ................................................... 25, 33

*United States v. Fernandez-Castillo,*
  324 F.3d 1114 (9th Cir. 2003) ....................................................... 29

*United States v. Harger,*
  313 F. Supp. 3d 1082 (N.D. Cal. 2018) .................................... 28, 29

*United States v. Job,*
  871 F.3d 852 (9th Cir. 2017) ........................................................ 24

*United States v. Jones,*
  565 U.S. 400 (2012) ...................................................................... 24

*United States v. Lopez-Armenta,*
  400 F.3d 1173 (9th Cir. 2005) ....................................................... 14

*United States v. Lundin,*
  817 F.3d 1151 (9th Cir. 2016) ....................................................... 24

*United States v. Mendenhall,*
  446 U.S. 544 (1980) ....................................................................... 24

*United States v. Montero-Camargo,*
  208 F.3d 1122 (9th Cir. 2000) (en banc) ....................................... 38

*United States v. Morales,*
    252 F.3d 1070 (9th Cir. 2001) .................................................... 27, 32

*United States v. Rowland,*
    464 F.3d 899 (9th Cir. 2006) ............................................................ 30

*United States v. Scott,*
    705 F.3d 410 (9th Cir. 2012) ............................................................ 24

*United States v. Terry-Crespo,*
    356 F.3d 1170 (9th Cir. 2004) ................................................. *passim*

*United States v. Thomas,*
    863 F.2d 622 (9th Cir. 1988) ............................................................ 41

*United States v. Vandergroen,*
    964 F.3d 876 (9th Cir. 2020) .................................................... *passim*

*United States v. Vasey,*
    834 F.2d 782 (9th Cir. 1987) ............................................................ 24

*United States v. Washington,*
    387 F.3d 1060 (9th Cir. 2004) .......................................................... 23

*United States v. Washington,*
    490 F.3d 765 (9th Cir. 2007) ............................................................ 24

*Wong Sun v. United States,*
    371 U.S. 471 (1963) ......................................................................... 36

## Federal Statutes

18 U.S.C. § 922 ....................................................................................... 13

18 U.S.C. § 3231 ....................................................................................... 1

28 U.S.C. § 1291 ....................................................................................... 1

v

## State Cases

*Baptiste v. State,*
    995 So. 2d 285 (Fla. 2008) ...................................................................  28

*Miles v. United States,*
    181 A.3d 633 (D.C. 2018) ..................................................................  28

*People v. Reyes,*
    896 N.Y.S.2d 301 (N.Y. App. Div. 2010) ..........................................  43

## Other Authorities

Fed. R. App. P. 4 ....................................................................................  1

Ninth Cir. R. 27–14 ................................................................................  1

## JURISDICTION AND BAIL STATUS

This is a direct criminal appeal from the United States District Court for the Northern District of California, the Honorable Susan Illston presiding. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered judgment on February 6, 2023 (1-ER-2–8), and James Talley timely appealed on February 3, 2023 (3-ER-446). *See* Fed. R. App. P. 4(b)(1)(A)(i).

Talley received a time-served custodial sentence and is currently serving a term of supervised release. (1-ER-3–4.)

## ISSUE PRESENTED

Whether the arresting officers had reasonable suspicion that Talley possessed a firearm and was dangerous when they seized and frisked him.

## STATEMENT OF THE CASE

### I. An anonymous 911 caller reported a white Latino man with a gun on the second floor of the Civic Center Inn.

On Monday, November 15, 2021, at approximately 10:13 a.m., a San Francisco 911 operator received an anonymous call that lasted two-and-a-half minutes. (3-ER-426; Ex. 9.)[1] At the beginning, a male caller stated,

---

[1] Exhibits 9, 10, 16, 17, 18, 19, and 20 are either audio or video recordings admitted into evidence at the evidentiary hearing. *See* 3-ER-229. All pin citations for the audio or video recordings are to the minute and second of

"Hey, I'm at 790 Ellis. This is the front desk. I want to be anonymous."
(Ex. 9 at 0:07–0:12.) The caller said that there was a man with a gun who
was trying to get into a room and that he was on the second floor of 790
Ellis.[2] (*Id.* at 0:12–0:20.) He described the man as wearing blue jeans, white
shoes with "a little Nike, a little black on them," a black jacket, a beanie,
and a mask over his face. (*Id.* at 0:21–0:35.) When the operator asked about
the suspect's race, the caller said he could not tell, because he was wearing
a mask. (*Id.* at 0:35–0:40.) A couple seconds later, the caller said that he
looked Latino, and was about 5 feet 9 inches. (*Id.* at 0:42–0:46.) Next, the
operator asked if the suspect was "small, medium, or heavy build" and the
caller said that the man looked slim, but that his jacket made him look a bit
bigger. (*Id.* at 0:47–0:56.) The operator then asked whether the suspect had
a mask on his face, to which the caller answered in the affirmative. (*Id.* at
0:56–1:01.)

Next, the operator asked what type of gun the caller saw. (Ex. 9 at 1:03–
1:06.) The caller responded, "I didn't. I didn't. Somebody else seen [sic] it.
He dropped it . . . right here from his waistband and picked it back up."
(*Id.* at 1:06–1:14.) The operator tried to confirm that the caller did not see
the gun, asked whether it was large gun or a small handgun, and asked for

---

relevant portion of the recording. Filed contemporaneously with this brief
is a motion to transmit these physical exhibits. *See* Ninth Cir. R. 27–14.

[2] 790 Ellis is the address of the Civic Center Inn, a motel in the Tenderloin
neighborhood of San Francisco. (3-ER-241.)

any additional description of the gun that she could give to officers. (*Id.* at 1:14–1:26.) The caller simply responded, "No." (*Id.* at 1:26–1:28.) The operator then asked follow-up questions about which rooms the suspect was going towards on the second floor. (*Id.* at 1:28–1:39.) The caller paused for a few seconds and seemed to be speaking to someone else in the background in Spanish. (*Id.* at 1:39–1:45.) The operator said, "hello?" to catch the caller's attention. (*Id.* at 1:45–1:46.) The caller responded in frustration, stated that the housekeepers were getting nervous, and asked whether anyone was going to come to 790 Ellis. (*Id.* at 1:46–1:51.) Sounding exasperated, the operator again tried to follow up about which way the man was heading on the second floor. (*Id.* at 1:50–1:54.) The caller did not answer her question; instead, he said that the suspect was still in the same place on the second floor wearing a black shirt, black jeans, black gloves, a beanie, and white shoes. (*Id.* at 1:54–2:14.) During this time, there was commotion in the background, and the anonymous caller seemed to be speaking with other individuals. (*Id.*) He never explained who he was talking to, nor identified the source of his information about the man with a gun. (*Id.*)

The operator then told the caller to have the staff direct the police to the suspect so that they knew whom to look for. (Ex. 9 at 2:17–2:23.) The caller refused, saying he would not. (*Id.* at 2:23–2:26.) The caller then said, "Ok, fuck it, then don't do nothing then, thank you." (*Id.* at 2:26–2:30.) The operator and caller began talking over each other; the operator asked how

3

they would know who to look for, to which the caller responded, "No. Don't do nothing.  We're not going to jeopardize our staff and get hurt." (*Id.* at 2:30–2:36.)  The operator talked over the caller and said, "They're coming to see the person.  Bye bye," and hung up abruptly.  (*Id.* at 2:34–2:36.)

San Francisco Police Department (SFPD) dispatch relayed certain information collected by the 911 operator to nearby officers.  The computer-assisted dispatch (CAD) entry, which was sent to officers' in-car computers, listed the location of the event as the second floor of 790 Ellis Street, the type of dispatch as a "221" (i.e., a person with a gun), and under the "Name" section listed "FRONT DESK DAREA [sic]."  (2-ER-189; 3-ER-426.)  The sum of the narrative description was as follows: "RP BEING ADVS BY STAFF THAT MALE ON 2ND FLR HAS A GUN IN HIS WAISTBAND OF PANTS 221 WML [white male Latino] 5'9 SLM BLD BEANIE BLK JKT BLK SHIRT BLK JEANS WHI SHOES WBLK NIKE LOGO."  (3-ER-426.)  In the audio recording of the SFPD dispatcher, he relayed this same information to the responding officers.  (Ex. 10.)

## II. SFPD officers responded to the motel.  They searched Talley, a Black man, in the rear ground-level parking lot.

Sergeants Justin Erb and Brian Hopkins arrived first at the Civic Center Inn, a motel at 790 Ellis Street.  They parked their police car on the street near the front parking lot of the motel, which is three stories with external,

open staircases and corridors. (Ex. 20 at 0:01–0:32.) They were joined seconds later by Officers Brian Conway and John Silvestri, who arrived in their own police car. (Ex. 17 at 0:01–0:37; Ex. 19 at 0:01–0:32.)

Erb and Hopkins, with pistols drawn, headed up the front staircase to the second level, and walked toward the rear of the building, which is adjacent to Olive Street. (Ex. 20 at 0:32–1:30.) Conway and Silvestri, holding a pistol and shotgun respectively, followed them toward the same staircase near the front parking lot, which is depicted below. (Ex. 17 at 0:37–0:59; Ex. 19 at 0:32–0:49.)



(Ex. 19 at 0:31 (depicting front parking lot).)

As Conway and Silvestri walked towards the stairs, a man on the phone walked from the front parking lot of the motel towards Ellis Street. The man was a white male Latino and was wearing a black jacket, grey pants,

and black baseball hat. (Ex. 17 at 0:34–0:37; Ex. 19 at 0:28–0:32; 2-ER-195; 3-ER-268.) As Conway and Silvestri went up the stairs from the ground level to the second floor, Conway saw the man on the phone, paused and asked Silvestri if he was the suspect that matched the description. Silvestri responded, "No. He's all black, slim." (Ex. 19 at 0:53–1:03; Ex. 17 at 0:58–1:08.)

Once the officers were on the second floor, Erb and Hopkins walked towards the rear of the building facing Olive Street through the interior hallway closest to the stairwell. (Ex. 19 at 1:15–1:18; Ex. 20 at 1:15–1:30.) Conway and Silvestri were about to follow them, but saw a woman wearing a maroon T-shirt over a gray hoodie waving, and they headed toward her. (Ex. 19 at 1:18–1:28.) The woman, who spoke English with a strong accent, said, "He's in the parking lot in the back." (Ex. 19 at 1:28–1:32.) Conway responded, "In the back? With the cars?" (Ex. 19 at 1:32–1:34.) The woman responded, "Yes." (Ex. 19 at 1:31–1:35.) Conway said, "Not in the building. In the parking lot?" (Ex. 19 at 1:35–1:37.) The woman spoke quickly and said, "Not right now, but he was opening the door." (Ex. 19 at 1:37–1:41.) Conway then asked what the suspect looked like. (Ex. 19 at 1:41–1:42.) The woman did not respond; she pointed down a hallway towards Olive Street and said, "This, over there. In the parking lot." (Ex. 19 at 1:41–1:45.) She stayed behind the officers during this time. (*Id.*) Confused, Conway pointed towards a hotel room on the right side of the hallway and asked if she was pointing to the hotel room door. (Ex. 19

6

at 1:45–1:48.)  The woman responded, "No, in the parking lot."  (Ex. 19 at 1:47–1:49.)  Conway and Silvestri then walked down a hallway towards the rear parking lot, with the woman remaining at some distance behind them. (Ex. 19 at 1:50–1:54.)

Erb and Hopkins got to the rear of the building facing Olive Street first, which also had an exterior corridor overlooking the rear parking lot, as depicted below.  (Ex. 20 at 1:25–1:32.)



(Ex. 20 at 1:44 (depicting rear exterior corridor and rear parking lot.)  They saw a man standing on the second floor who appeared to be Latino (or possibly Black) wearing a black shirt, long black shorts, and black shoes. Erb said to Hopkins, "there's one right there, right there" and proceeded to walk towards the man on the second floor.  (Ex. 20 at 1:25–1:32; Ex. 17 at 1:59–2:05; 2-ER-180; 2-ER-184.).  As they walked towards the man, Erb told

dispatch he "might have eyes on, on the Olive Street side." (Ex. 20 at 1:36–1:40.) During this time, a man in all black walked past the hotel on the sidewalk of Polk Street towards O'Farrell Street. (Ex. 20 at 1:49–1:55.)

Conway and Silvestri then arrived via a different interior hallway, farther from the stairwell, at the back of the second floor of the motel facing the rear parking lot, where Erb and Hopkins were already present. (Ex. 20 at 1:58–2:00; Ex. 17 at 1:58–1:59.) During this time, the woman in the maroon T-shirt stayed behind them in the interior hallway; she did not have a direct view of the parking lot. (Ex. 17 at 1:57–1:58.) Silvestri quickly asked other officers where the suspect was. (Ex. 17 at 1:58–1:59.) Hopkins pointed towards the parking lot, began frisking the man standing on the second floor and said, "There is someone right here." (Ex. 20 at 1:58–2:00.) At this point, James Talley was crouched down in an empty parking space in the rear parking lot, looking through a bag. (Ex. 20 at 1:59–2:02.) Silvestri pointed his shotgun down towards the parking lot where Talley was and responded, "That's not him." (Ex. 17 at 2:01–2:02; Ex. 20 at 2:00–2:03.)

Hopkins continued to frisk the man on the second floor. (Ex. 17 at 1:58–2:02.) Looking around the parking lot, the officers saw Talley bent over a black bag. (Ex. 19 at 1:58–2:02.) During this incident, Officer Nguyen, who arrived at the scene after the other officers, saw the same woman in the maroon T-shirt on the second floor of the front side of the building facing Ellis Street. (Ex. 18 at 1:04–1:09.) The woman pointed down the interior

8

hallway to where the other officers were located and said, "There is a guy in the parking lot." (Ex. 18 at 1:07–1:09.) Erb, who overheard this conversation from the Olive Street side then said, "Which one, which one?" (Ex. 17 at 2:06–2:08; Ex. 20 at 2:06–07.) With the woman staying behind him, Nguyen ran towards the other officers and asked her, "What car?" to which the woman responded, "This is the guy." (Ex. 17 at 2:08–2:10; Ex. 18 at 1:09–1:13.) Nguyen ran through the interior hallway towards the other officers standing on the second floor corridor facing the rear parking lot and pointed to Talley saying "They're saying that it was this guy." (Ex. 18 at 1:09–1:15; Ex. 17 at 2:09–2:11.) The woman remained in the interior hallway during this entire time without ever having a direct view of the parking lot or anyone in it. (*Id.*)

Silvestri then focused his attention on Talley. While pointing a shotgun toward Talley, Silvestri said: "Hey. Don't reach in your pockets right now, man. How about this? Don't reach for shit! You hear me? You hear me?" (Ex. 17 at 2:20–2:25; Ex. 18 at 1:24–1:30.) Talley stood up and put his arms out. (*Id.*) Nguyen said, "They said it was this guy in the parking lot," and the woman called out from the interior hallway, "Yeah, yeah." (Ex. 17 at 2:31–2:35; Ex. 18 at 1:35–1:38.) Conway and Erb then climbed over the rail on the exterior corridor and down from the second floor to the rear parking area. Conway trained his pistol on Talley and told him to go toward a white car. (Ex. 19 at 2:10–2:36; Ex. 20 at 2:30–2:47.) Talley backed up, and moved toward the white car. Conway told him to place his hands on his

head. Talley put his hands on his head, and turned around facing the white car. (Ex. 19 at 2:36–2:42.) Conway then grabbed hold of Talley's hands to restrain him. (Ex. 19 at 2:42–2:44; Ex. 17 at 2:46–2:52.)

While Conway was restraining Tally, Erb approach and frisked Talley. (Ex. 20 at 2:51–3:05.) Erb then more fully searched Talley, and removed a wallet, cell phone, and a loaded pistol from the front pocket of Talley's hoodie. (Ex. 20 at 3:05–3:20; 3-ER-441.) Talley was then arrested, handcuffed, and placed in a patrol vehicle. (3-ER-441–43; 3-ER-445.) Neither the white Latino man wearing a black hoodie, black hat, grey pants, and black shoes (seen leaving the motel as the officers arrived), nor the other man dressed in black (walking north on Polk Street when the officers called out to Talley), were detained or frisked by the officers.

Once Talley was arrested , Silvestri and Hopkins walked down the stairs to the ground floor. As they did, Silvestri stated, "Dude, that [call] came out as a Latin male." (Ex. 17 at 4:12–4:14.) Hopkins responded, "Yeah no shit, that's why I was looking at the dude," and pointed to the area on the second-floor corridor where he had searched the Latino male. (*Id.* at 4:14–4:17.) Silvestri then said in disbelief, "That's why I was like, this dude is a Black dude! Came out as a Latin male." (*Id.* at 4:17–4:20.)

Down in the parking lot, Hopkins, Nguyen, and Erb also discussed dispatch's description of the suspect. Hopkins said how he wished dispatch had given a better description of the location, and Erb agreed. (Ex. 18 at 7:47–7:53.) Nguyen pointed to the second floor where the police

10

saw the man standing in the outside corridor facing the rear parking lot and added, "We were about to detain that guy." (*Id.* at 7:53–7:55.) Hopkins said that was why he patted down the man on the second floor. (*Id*. at 7:54–7:58.) Erb agreed and said, "that guy matched the description a little better." (*Id.* at 7:57–7:59.)

When Silvestri joined the officers in the parking lot, they discussed whether the woman in the maroon T-shirt saw Talley during the effort to find the suspect and Talley's arrest. During this discussion, Hopkins and Nguyen inaccurately stated the woman saw Talley when she was pointing towards the parking lot. But Silvestri corrected them and said she never had eyes on Talley, noting that she was afraid to come down the interior hallway toward the rear parking lot. (Ex. 18 at 9:41–9:58.) Silvestri expanded on this point, stating that, from the interior hallway without a view of the parking lot, "[s]he was clearly there pointing. Cause there were two, remember?" (*Id.* at 10:00–10:05.) Silvestri pointed in two separate directions and continued, "And then we were like, who? Where is this HM [Hispanic male] dude? And then I was like what? This guy [Talley]?" (*Id.* at 10:05–10:16.)

Meanwhile, Conway went to the hotel reception area and spoke with the female receptionist and the woman in the maroon T-shirt they encountered on the second floor. The officers learned the latter's name was Maria Ornelas and that she was a hotel housekeeper. Both the receptionist and Ornelas were Spanish speakers. Conway asked in broken Spanish

11

whether they called 911, and the receptionist responded in English, "No. Somebody called. It was a guy." (Ex. 19 at 10:42–10:51.) Conway asked again whether the receptionist and Ornelas called 911, and the receptionist responded (in English), "No. We called from here. The person, he doesn't want to be involved." (*Id.* at 10:51–11:02.)

Conway later wrote the primary SFPD Incident Report setting forth a narrative of the events from the investigation at the Civic Center Inn. (3-ER-441–43.) Officer Ernesto Linares and Erb provided supplemental statements to the report, because Linares had served as a Spanish interpreter for Ornelas in a later interview, and it was Erb who searched and arrested Talley at the scene. (3-ER-444–45.)

Surprisingly, Conway's report claimed that once the officers arrived at the rear parking lot side of the Civic Center Inn, Talley "was the only person in the area matching the previous description provided by Dispatch and [Ornelas]." (3-ER-441.) According to Conway, based on this and the "directions from an independent witness," the officers detained, searched, and arrested Talley. (3-ER-441.) Conway's report did not mention that dispatch identified the suspect was a white male Latino—or that Talley is an African-American man with a medium to dark complexion. Nor did Conway mention that Ornelas never actually provided police with a description of anyone before they detained and searched Talley. (3-ER-441.)

### III. Talley was charged with being a felon in possession of a firearm, and moved to suppress evidence obtained from the officers' warrantless search of his person.

About two months after his arrest, a federal grand jury charged Talley with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (3-ER-422–27.) The magistrate placed Talley in pre-trial detention. (3-ER-421.)

Talley filed a motion to suppress the gun the officers obtained via the seizure and search of his person. (3-ER-401–20.) Specifically, he argued that the warrantless seizure and search of his person were presumptively unreasonable; that the anonymous 911 call, not relaying first-hand or predictive information, lacked sufficient indicia of reliability to support reasonable suspicion to detain and search him; and notwithstanding the call, the officers still lacked reasonable suspicion to detain and frisk him, because Talley did not match dispatch's description of a "white Latino" male on the second floor of the motel. (*Id.*) The government opposed the motion, arguing the 911 call was sufficiently reliable and Talley "generally matched" the description provided in the call. The government also opposed Talley's request for an evidentiary hearing. (3-ER-380–400.)

### IV. The district court initially denied the motion to suppress, but sua sponte vacated its order so it could hold an evidentiary hearing.

On June 21, 2022, the district court held a hearing on the suppression motion. (3-ER-356–79.) At the outset, the court noted that, after reviewing

the 911 call recording and the body-camera footage, this was "a very difficult" and "really close" case. The court nonetheless stated its tentative ruling would be to deny the suppression motion. (3-ER-358.)

On July 4, 2022, the district court issued a written order denying the suppression motion and Talley's request for an evidentiary hearing. (3-ER-343–55.) The next day, at a status conference, Talley's counsel indicated that Talley did not plan to go to trial, and he only wished to preserve his right to appeal the suppression ruling by means of a conditional plea or a stipulated-testimony bench trial.[3] (3-ER-336–37.) The government subsequently advised Talley, however, that it would not agree to a conditional guilty plea, and it would insist on either an unconditional guilty plea or a jury trial. (3-ER-330–34.)

At the next status conference, the district court asked the prosecutor why the government wouldn't agree to a bench trial, noting that a jury trial would be a waste of resources since Talley only wished to preserve his appellate rights, and did not contest factual guilt. (3-ER-318–19.) The prosecutor incongruously responded that the government wished to develop a more fulsome factual record because Talley would be appealing

---

[3] An unconditional guilty plea would have barred Talley from appealing the denial of his suppression motion. *See, e.g., United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005) ("[B]y entering an unconditional guilty plea, [the defendant] waived his right to bring this appeal, which seeks only to challenge the district court's ruling on his motion to suppress.").

the denial of the suppression motion.  (3-ER-319–20.)  Noting the same
record would be developed at a bench trial or a jury trial, the court stated,
"I think what the Government is trying to do is pressure Talley into giving
up his appeal on the motion. . . .  And I think it's doing it in an improper
way."  (3-ER-322.)  The government disputed the court's observation.  (*Id.*)

Talley's counsel alternatively suggested that the district court
reconsider its ruling and hold an evidentiary hearing on the suppression
motion, as Talley had originally requested, which would also provide a
more complete record on appeal.  (3-ER-323, 3-ER-325.)  The district court
agreed, vacated its prior ruling, granted reconsideration, and ordered an
evidentiary hearing on the suppression motion.  (3-ER-326; 3-ER-329.)

### V. The district court conducted an evidentiary hearing.

The district court held a two-day evidentiary hearing on Talley's
motion.  The testifying witnesses were SFPD officers Conway, Erb,
Hopkins, and Silvestri, as well as Ornelas, the motel housekeeper.  (2-ER-
128–225; 3-ER-227–316.)

On the first day, Conway testified, as relevant, that he encountered a
white male Latino, wearing a black hoodie, black hat, and grey jeans in the
front parking lot of the motel; Conway said he believed the man could
have been the suspect, which is why he asked his partner, Silvestri, "Is that
him?"  (3-ER-267–69.)  Conway acknowledged that as to race, this man was
a closer match to the suspect broadcast by dispatch than Talley.  (3-ER-269–

70.)  Conway also acknowledged that when Ornelas approached him on the second floor, she never mentioned a gun or any 911 call.  (3-ER-274–75.)  Conway also admitted he saw that Talley was African American before he laid hands on him in the rear parking lot.  (3-ER-280.)  Conway further testified that although dispatch described the suspect as wearing white shoes with a black Nike logo, Talley was wearing white shoes with a red Reebok logo.  (3-ER-257–58; 3-ER-434.)  After Talley's arrest, Conway spoke to Ornelas through Linares, a Spanish-speaking officer, who interpreted his questions.  Ornelas told Conway that 20 to 30 minutes had elapsed between when she saw the man with the gun and when the police arrived.  (3-ER-291.)

A week later, the evidentiary hearing continued for a second day.  (2-ER-128.)  Ornelas testified that she was working at the Civic Center Inn on November 14, 2021.  (2-ER-131–32.)  While cleaning the rear parking lot of the motel, Ornelas saw a man wearing black pants and a black hoodie drop a gun, pick it back up, and put it into his hoodie's pocket.  (2-ER-132–33.)  Ornelas remained in the parking lot area, continuing to clean, for 15 minutes after seeing the gun.  After the man looked at her, she went to the motel's front desk.  As she left the parking lot, the man climbed up to the motel's second floor.  (2-ER-134.)

At the front desk, Ornelas told Christina, who worked at the front desk, that there was a man with a weapon.  Christina's son, Victor, was also at the front desk area, though he did not work for the motel.  A customer was

16

also present near the front desk area.  Christina and Ornelas looked at the motel's security cameras, which showed a man wearing all black approach Room 225.  (2-ER-135–36.)  After watching the man for five minutes, the customer called 911.  (2-ER-136–37.)  That same customer had recently been banned from the hotel for vandalizing a window.  (2-ER-148–49.)

Nonetheless, it was Victor's voice (not the customer's), that Ornelas recognized on the 911 call, and she was unsure what phone was used to place the call.  (2-ER-136–38.)  While on the 911 call, Victor was standing outside of the lobby, Ornelas and Christina remained inside, and Ornelas could not see Victor while he was on the phone.  Ornelas also testified that she did not speak directly to Victor while he was on the phone.  (2-ER-149.)  By the time the 911 call was placed, Ornelas and Christina could no longer see the man on the security cameras because he had entered Room 215.  (2-ER-139–40.)

Erb, Hopkins, and Silvestri also testified.  (2-ER-152–98.)  Hopkins testified that the man standing on the second floor was "a better match" to the suspect described by dispatch because he was a Latin male, and because of his location (on the second floor).  (2-ER-179–81.)  Silvestri testified that the housekeeper (Ornelas) never said she had seen a man with a gun, did not reference any 911 call, did not indicate that she knew why the officers were there, and only directed the officers to the parking lot.  (2-ER-191–92.)  Silvestri further testified that Ornelas did not follow him and Conway toward the back of the building to the second-floor balcony

17

overlooking the rear parking lot, and she was never within view of the parking lot while he was present.  (2-ER-192–94.)  Silvestri admitted that, from the second-floor balcony, he could see that the man in the rear parking lot (Talley) was *not* a white male Latino; he did not believe that man matched the description provided by dispatch; and this was why Silvestri said, "That's not him."  (2-ER-195–96.)

At the close of the second day of the evidentiary hearing, the district court requested further briefing from the parties in light of the evidence presented.  (2-ER-219–22.)  The parties complied with the court's request.  (2-ER-77–127.)

## VI. The district court again denied Talley's motion to suppress.

Nearly two months after the evidentiary hearing, the district court issued its final order denying Talley's suppression motion.  (1-ER-9–22.)  The court concluded that the case fell somewhere between this Court's decision in *United States v. Vandergroen*, 964 F.3d 876 (9th Cir. 2020), in which the Court held a 911 call provided sufficient indicia of reliability to supply reasonable suspicion, and this Court's decision in *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), and the Supreme Court's decision in *Florida v. J.L.*, 529 U.S. 266 (2000), both of which held that an anonymous tip did not give rise to reasonable suspicion.  But the court ultimately concluded this case was closer to *Vandergroen*.  (1-ER-19.)

Specifically, the district court held that the fact the tip was to 911 favored its reliability.  (1-ER-19.)  As to the anonymity of the tip, the district court stated that the tipper here was "not entirely anonymous" because he identified that he was calling from the "front desk" of the address he gave, and that the logical inference was that the tipper was an employee of the motel.  (1-ER-19)  The district court held that the information was fresh, and was apparently not second- or third-hand because Ornelas's voice could be heard in the background of the 911 call.  (1-ER-19–20.)  The district court especially emphasized that Ornelas flagged down the officers and said "the man" was in the back parking lot, finding it of no moment that she did not have eyes on Talley when the officers arrived or subsequently. (1-ER-20–21.)  The court further determined that the officers properly relied on Ornelas's statements that "the man" was in the rear parking lot, even though she never mentioned a gun, explained who she was, or otherwise explained what she was talking about.  (1-ER-21.)  Finally, the district court determined that Talley "generally matched" the description provided by dispatch because he was wearing black clothing and white shoes, finding the discrepancies between the dispatch description and Talley's race, location, and other aspects of his clothing (i.e., his lack of a beanie hat, black jacket, or Nike shoes) did not dispel any reasonable suspicion.  (1-ER-22.)

## VII. Talley entered a conditional guilty plea, preserving his right to appeal the denial of his suppression motion, and received a time-served sentence.

After initially refusing to enter into any conditional guilty plea that would allow Talley to appeal the district court's suppression ruling, the government eventually acceded, extending Talley a conditional plea agreement. (2-ER-58–76.) Talley specifically agreed to plead guilty to the sole count against him, reserving the right to challenge the denial of the suppression motion but otherwise waiving his appellate rights. (2-ER-72–76.) The district court accepted Talley's plea. (2-ER-58–71.)

The Presentence Report (PSR) calculated a Guidelines range of 30–37 months, and recommended a downward variance to 24 months. (PSR ¶ 75; PSR Sent. Rec. at 1.) Talley argued for a time-served sentence, with a special condition of supervision requiring him to reside in the halfway house for six months, noting that such a sentence would be roughly equivalent to what the PSR had recommended, given the amount of time he had already spent in pretrial detention, and that he would have been eligible to serve the final portion of his sentence in the halfway house had his case resolved more quickly. (2-ER-51–57.) The government recommended a 30-month bottom-of-Guidelines sentence. (2-ER-46–50.) The district court sentenced Talley to time served, subject to his spending the first six months of supervised release in the halfway house. (1-ER-3–6;

2-ER-39–40.)  The district court entered its written judgment, and this timely appeal followed.  (1–ER-2–8; 3-ER-446.)

## SUMMARY OF ARGUMENT

The district court's order denying Talley's suppression motion was wrong for two reasons, both of which independently require reversal. First, the anonymous 911 call lacked sufficient indicia of reliability to supply reasonable suspicion to seize and frisk Talley.  Four of the five factors identified by this Court in *Vandergroen* do not support the reliability of the tip here.  *See* 964 F.3d at 879–80.  The tipper here expressly refused to give his name to the 911 operator, which makes any information from him less reliable than from a known caller, whose reputation can be assessed and who can be held accountable for misrepresentations.  Nor did the tipper reveal the source of his knowledge, and he was unable to answer basic follow-up questions posed by the operator.  Most importantly, the anonymous 911 caller provided no predictive information about the suspect, which the Supreme Court has repeatedly emphasized is especially important to bolstering the reliability of anonymous tips.  And the information relayed by the tipper was neither first-hand information that he himself had observed, nor especially fresh, with at least 20 minutes having elapsed since Ornelas saw the gun.

The only factor favoring the reliability of the tip here was that the call was to 911 rather than a non-emergency number.  But taken together, the

21

relevant factors do not evince sufficient indicia of reliability to give rise to reasonable suspicion to seize and frisk Talley. And while the district court emphasized Ornelas's directing the officers to the rear parking lot at the motel, Ornelas's statements and actions did not independently provide reasonable suspicion that Talley was armed and dangerous because she never mentioned any illegal activity, the 911 call, a gun, or otherwise why she was directing the officers to the rear parking lot.

Second, even if the Corut were to conclude that the anonymous 911 call was sufficiently reliable, any reasonable suspicion it provided dissipated when the officers encountered Talley and other potential suspects at the motel. Talley, who is Black, did not match the dispatch description of a white Latino male. And there were two other men the officers passed at the motel who were Latino and were also wearing black clothing, one of whom was standing on the second floor, where dispatch had indicated the suspect would be—unlike Talley who was standing in the rear parking lot. Finally, although Talley's black clothing and white sneakers partially matched dispatch's description of the suspect compared to the other two men, the vagueness and generality of this description was not sufficient to support reasonable suspicion.

The officers thus lacked reasonable suspicion to detain and search Talley both because the anonymous 911 call lacked sufficient indicia of reliability, and because the officers' subsequent observations at the motel

dispelled rather than confirmed any reasonable suspicion that Talley had a gun.

## ARGUMENT

**I. The district court erred in denying Talley's motion to suppress because the officers lacked reasonable suspicion to seize and frisk Talley.**

### A. Standard of review

This Court reviews de novo the district court's denial of a motion to suppress. *Vandergroen*, 964 F.3d at 879. This Court reviews for clear error any underlying factual findings by the district court. *Id.*

### B. The officer's warrantless seizure and search of Talley was presumptively unreasonable.

An individual is seized within the meaning of the Fourth Amendment "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts [his] liberty." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotation omitted). A person's liberty is restrained when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Courts also have described the standard for a seizure as whether, in view of all the circumstances, "a reasonable

person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (same). A "search" occurs, for Fourth Amendment purposes, under either of two circumstances: when a government agent (1) infringes an individual's reasonable expectation of privacy, or (2) physically intrudes on a constitutionally protected area to obtain information. *United States v. Jones*, 565 U.S. 400, 404–08 (2012); *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016).

Here, the SFPD officers seized and searched Talley without any warrant. Specifically, Talley was "seized" for Fourth Amendment purposes when Silvestri commanded him not to reach for anything and trained his weapon on Talley, and Talley raised his arms. *See Hodari D.*, 499 U.S. at 626–27. It is well established that warrantless seizures and searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). The government, therefore, bore the burden of proving a warrantless seizure or search was lawful, and it was required to do so by a preponderance of the evidence. *United States v. Job*, 871 F.3d 852, 862–63 (9th Cir. 2017); *Scott*, 705 F.3d at 416; *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987). While police officers may lawfully stop a person whom they reasonably suspect may be committing criminal activity, and frisk a person they reasonably suspect is

24

armed and presently dangerous, *see Terry v. Ohio*, 392 U.S. 1, 30 (1968), the officers here lacked reasonable suspicion to detain or frisk Talley because the anonymous 911 call was insufficiently reliable, and because the subsequent events at the motel did not give rise to reasonable suspicion that Talley was armed and dangerous.

C. The tip from an anonymous 911 caller without first-hand information lacked sufficient indicia of reliability to provide reasonable suspicion to seize or frisk anyone.

The Fourth Amendment allows brief investigative stops only "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)). A tip such as a 911 call may provide such reasonable suspicion to justify a stop only if it exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (quoting *Alabama v. White*, 496 U.S. 325, 326–27 (1990)). Further, even when an anonymous tip concerns illegal gun possession, and when a suspect matches the tipster's description as to race and attire, the *Terry* standard is not satisfied. *See Florida v. J.L.*, 529 U.S. 266, 268 (2000).

Specifically, in *J.L.*, an anonymous caller reported to the Miami police "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* Some time later, two officers

responded to the bus stop, and saw a group of three black males, one of whom, J.L., was wearing a plaid shirt. *Id.* An officer frisked J.L. and found a gun in his pocket, resulting in J.L.'s being charged with being a minor illegally in possession of a concealed firearm. *Id.* at 268–69.

The Supreme Court held that this tip was insufficiently reliable because the tipper was anonymous and his reliability could not be assessed, because the tip contained no predictive information, and because the lack of specificity of the description of the suspect did not establish the reliability of the information. *Id.* at 270–72. Finally, the Court in *J.L.*, expressly rejected the position that a tip concerning illegal gun possession creates a "firearm exception" to the Fourth Amendment, and reaffirmed that the standard protections of *Terry* still apply in those circumstances. *See id.* at 272 (rejecting government's argument that "the standard *Terry* analysis should be modified to license a 'firearm exception.' Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.").

This Court, moreover, has subsequently "identified a number of factors that can demonstrate the reliability of a tip," including the following:

- "whether the tipper is known, rather than anonymous,"
- "whether the tipper reveals the basis of his knowledge,"
- "whether the tipper provides detailed predictive information indicating insider knowledge,"

- "whether the caller uses a 911 number rather than a non-emergency tip line,"
- "and whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge."

*United States v. Vandergroen*, 964 F.3d 876, 879–80 (9th Cir. 2020). Under these factors, the anonymous 911 call here lacked sufficient indicia of reliability to provide reasonable suspicion to stop or frisk Talley.

### 1. The tipper was anonymous.

As to the first factor identified in *Vandergoen*, the tipper here was not a known person, but instead was anonymous, and expressly stated at the outset of the phone call that he wanted to remain anonymous. *See* Ex. 9 at 0:08–0:12. As the Supreme Court has observed, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *J.L.*, 529 U.S. at 270 (quoting *White*, 496 U.S. at 329); *see United States v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001). This is because "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," an anonymous tipster's veracity cannot be assessed. *J.L.*, 529 U.S. at 270. Thus, the anonymous nature of the tip here does not support finding the 911 call to be reliable. *See id.*

The district court's suggestion that the tipper here was not anonymous was error. *See* 1-ER-19. Indeed, the 911 caller, at the very outset of the call,

27

expressly stated, "I want to be anonymous." *See* Ex. 9 at 0:08–0:12. The caller's express desire to remain anonymous strongly undermines the reliability of his information. *See, e.g., United States v. Harger*, 313 F. Supp. 3d 1082, 1090 (N.D. Cal. 2018) (emphasizing that "the caller affirmatively refused to provide her name and phone number," which undermined the reliability of the tip); *Miles v. United States*, 181 A.3d 633, 639 n.12 (D.C. 2018) (relying on "the caller's apparent intention to remain anonymous" in concluding that 911 call did not provide reasonable suspicion); *Baptiste v. State*, 995 So. 2d 285, 288, 301 (Fla. 2008) (finding no reasonable suspicion from tip by "anonymous caller and [who] intended to remain anonymous").

Further, there is a double or even triple layer of anonymity here because the caller also failed to provide the name or any identifying information about the source of the information he was relaying. According to Ornelas's testimony, she was not in the same room as Victor during any 911 call, and she stated that she did not speak directly to him. *See* 2-ER-149. The only logical inference is that Ornelas was passing information onto her supervisor Christina, who in turn passed it onto her son Victor, who was standing outside and speaking to the 911 operator. None of these individuals' names were shared with the 911 operator. Thus, not only was the 911 caller anonymous, but he was passing on information from a second (and possibly third) sources who themselves were anonymous.

28

The district court's suggestion that because some information could be gleaned about the caller means that he was "not entirely anonymous" is incorrect. *See* 1-ER-19. "Anonymous" means something that is "[n]ot named or identified." ANONYMOUS, Black's Law Dictionary (11th ed. 2019); *see also* "Anonymous*,*" Meriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/anonymous (noting Latin and Greek origins of "anonymous," both of which mean "lacking a name"). Here, the caller did not give a name or otherwise identify himself. Further, the district court's suggestion that because some information about the caller could be inferred does not alter the caller's anonymous status.

The district court's treatment of the anonymity factor is also at odds with the underlying rationale about why tips from sources who give their name are treated as more reliable: tippers who are known can be held accountable for fabrications. *See, e.g., United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003) ("In *J.L.*, the Supreme Court explained that anonymous tips are often unreliable because the tipster cannot be held accountable for fabrications and the tipster's reputation cannot be assessed." (citing 529 U.S. at 270)). Here, the tipper actively sought to avoid being held accountable by demanding to remain anonymous—and he disappeared from the scene before the police even arrived.[4] *See Harger*, 313 F. Supp. 3d at 1090 (N.D. Cal. 2018).

---

[4] The surname of Victor was never determined.

## 2. The tipper did not reveal the basis of his knowledge.

The anonymous caller here did not reveal the basis for his knowledge of the alleged person with a gun. *See Vandergroen*, 964 F.3d at 879–80. Indeed, when pressed by the dispatcher for details about the gun, the caller was unable to provide any, and he admitted that he had not himself seen *any* weapon. *See* Ex. 9 at 1:06–1:14. Nor did the caller reveal from whom he received the apparent second-hand information he was relaying to the dispatcher. Thus, the anonymous caller's refusal to provide any explanation for how he came to know the information he was passing on further undermined the reliability of his tip. *Cf. Vandergroen*, 964 F.3d at 880 (finding sufficient indicia of reliability for a 911 caller who explained that he worked at a bar and knew the defendant had a gun on him because multiple patrons told him that the defendant had a gun); *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006) (concluding there was sufficient basis for the tipper's knowledge when the known tipper explained "that he had personal knowledge of [the suspect's] activities because he had 'dealt with him in the past'").

The district court erroneously concluded that the caller's oblique references to "housekeeping" and "staff" during his call meant that he revealed the basis of his knowledge. *See* 1-ER-19. The district court's strained inferences from the caller's sparse statements stands in stark contrast to this Court's decisions finding tips sufficiently reliable. For

example, in *Vandergroen*, the 911 caller, who gave his name, explained that he was a bartender at a named specific bar, and stated that a man in the bar had a gun on his person. The caller explained that he was present at the bar and three customers there specifically told him that they had seen the suspect in possession of a gun; also, the bartender himself later saw the suspect (though not the gun) and gave a detailed description of him to the 911 operator. *See* 964 F.3d at 878. This detailed and express explanation of how the caller came to know the information he was relaying stands in stark contrast to the 911 caller's cryptic and evasive statements here, and his inability to answer even the 911 operator's simple questions. *Cf. id.*; *see also United States v. Terry-Crespo*, 356 F.3d 1170, 1172 (9th Cir. 2004) (finding tip sufficiently reliable when 911 caller stated he personally saw the suspect threaten him with a gun).

### 3. The tipper provided no detailed predictive information indicating insider knowledge.

The Supreme Court and this Court have repeatedly emphasized that the presence of detailed "predictive information" in an anonymous tip is an especially important factor in evaluating its reliability. *See, e.g., J.L.*, 529 U.S. at 272; *see also id.* at 271 ("The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility."); *Alabama v. White*, 496 U.S. 325, 332 (1990) (emphasizing the importance of an anonymous "caller's

ability to predict respondent's *future behavior*, because it demonstrated inside information—a special familiarity with respondent's affairs" in determining reliability of anonymous tips) (emphasis in original); *Foster v. City of Indio*, 908 F.3d 1204, 1215 (9th Cir. 2018) (finding an anonymous 911 tip reliable because, inter alia, the caller "predicted the suspect's route"); *Morales*, 252 F.3d at 1075–76 (emphasizing that for an anonymous tip to serve as the basis of reasonable suspicion, "it must predict future actions by the suspect that are subsequently corroborated by the police").

Notably, the district court's order in this case omits any mention of this factor at all in its analysis (other than in its summary of Talley's arguments). *See* 1-ER-9–22. This important factor unequivocally favors Talley, as the anonymous tipper provided no information to the 911 operator that was even remotely predictive in nature, and he struggled even to provide basic non-predictive information when asked. *See* Ex. 9. This contrasts markedly with the reliable anonymous tip in *White*, where the caller predicted that the defendant would leave a specific apartment building at a specified time, would get into a car matching a particular description, and would drive to a named hotel, all of which police independently corroborated. *See* 496 U.S. at 331–32. Here, when pressed for predictive information by the 911 operator, who asked the caller what direction the man was heading and which room he was near, the caller could provide none, in contrast to *White*. See Ex. 9 at 1:30–1:59. Anonymous tips, like the one here, that relay only allegations of general

32

criminality and lack any predictive information are insufficiently reliable. *See J.L.*, 529 U.S. at 271; *United States v. Edwards*, 761 F.3d 977, 984–85 (9th Cir. 2014) (describing the possession of a firearm in *J.L.* as involving "general criminality," and contrasting it to an emergency situation where the allegation was that the suspect was reported to be discharging a firearm).

### 4. The tipper used the 911 emergency number.

The anonymous tip here was made to 911, rather than a non-emergency number, which is the only factor that favors its reliability. *See Vandergroen*, 964 F.3d at 879–80; *Foster*, 908 F.3d at 1214 (deeming calls to 911 more credible than calls to non-emergency numbers). But this factor standing alone cannot establish sufficient indicia of reliability to support reasonable suspicion. Otherwise, this Court and the Supreme Court would have adopted a blanket rule that all tips from 911 calls are sufficiently reliable, which is decidedly not the case. *See, e.g., Navarette*, 572 U.S. at 401 ("The caller's use of the 911 system is therefore *one of the relevant circumstances* that, taken together, justified the officer's reliance on the information reported in the 911 call." (emphasis added)); *see also id.* at 398–99, 404 (describing as a "close case" whether a 911 call bore sufficient indicia of reliability, when the caller claimed first-hand eyewitness knowledge of a specific vehicle that had run her off the road).

**5. The tipper did not relay fresh, eyewitness knowledge; instead, he relayed stale, second-hand knowledge.**

Finally, the district court erroneously held that the 911 caller was relaying fresh, eyewitness knowledge, rather than stale, second-hand information.  *See* 1-ER-19–20.  Courts give greater weight to anonymous tipsters who provide first-hand information, and less weight to tipsters—like the caller here—who merely relay second- or third-hand information, particularly when such information is from an unknown source.  *See Vandergroen*, 964 F.3d at 880 (anonymous tip relying "eyewitness knowledge" is more reliable than such a tip relaying "second-hand knowledge"); *Terry-Crespo*, 356 F.3d at 1177 (stating that anonymous tips providing "second-hand information" are entitled to less weight).

Here, there is no dispute that the 911 caller was not an eyewitness, and was relaying (at best) second-hand information.  Indeed, he expressly said as much on the 911 call: when the operator asked him what type of gun he saw, he responded, "I didn't.  I didn't.  Somebody else seen [sic] it."  *See* Ex. 9 at 1:06–1:10.  Further, Ornelas's testimony was clear that only she—and not anyone else—ever saw a gun, and the 911 operator did not ask or establish who, if anyone, actually did.  *See* 2-ER-132–34; 2-ER-147–49.  Despite this Court's clear precedent favoring first-hand information over second-hand information, the district court's order quibbles about whether Victor was passing on second-hand or third-hand information, suggesting that because Ornelas's voice could be heard in the background of the 911

call that she was directly relaying what she had seen to Victor. *See* 1-ER-20. But Ornelas herself testified that she was inside the motel lobby during the 911 call, while Victor was outside and out of her view at the time, and that she never spoke directly to the 911 caller. *See* 2-ER-149.

More importantly, because it is first-hand information that this Court considers to be most reliable in anonymous 911 calls, it is ultimately immaterial whether the caller was relaying second- or third-hand information: neither are sufficiently reliable to provide reasonable suspicion. *See, e.g., Terry-Crespo*, 356 F.3d at 1176–77 (finding tipster's information more reliable because he related recent "first-hand information."). Specifically, in *Terry-Crespo*, the 911 caller, who gave his name, gave a detailed description of a man who had three minutes earlier threatened him directly with a handgun. *See id.* at 1172–73; *see also id.* at 1173–77 (finding 911 call had sufficient indicia of reliability). Here, whether Victor was relaying second-hand or third-hand information, he was not relaying first-hand information based on his own direct observation, which is what this Court has deemed reliable. *See id.*

As to the freshness of the information relayed by the caller here, it is also substantially less recent than the information relayed in other opinions from this Court which concluded a tip was sufficiently reliable. Here, at least 20 minutes had elapsed between the time Ornelas saw the gun and the call was placed to 911. *See* 2-ER-134; 2-ER-136; 2-ER-139; Ex. 16 at 25:10–25:31. By contrast, in *Terry-Crespo*, only three minutes had passed

35

between the caller's being threatened with a handgun and the 911 call. *See* 356 F.3d at 1172. And in *Vandergroen*, the bartender who had called 911 (and had given his name and personally observed the suspect) stayed on the line with the 911 operator, giving continuous live updates about his personal observations of the suspect's movements as he exited the first bar's parking lot and moved to a neighboring bar, as well as when the man started running and jumped into a black sedan, which the bartender described and relayed the direction in which it was headed. *See* 964 F.3d at 878. Thus, the contemporaneous information being relayed in *Vandergroen* was more fresh than that in *Terry-Crespo*, which itself was far more recent than the 20-minute-old information that was relayed here. *Cf. id.*

In sum, four of the five factors identified in *Vandergroen* cut against a determination that the 911 call in this case was sufficiently reliable to provide reasonable suspicion that any suspect at the motel was illegally in possession of a gun and armed and dangerous. *See id.* at 879–80. Further, the 911 call was the *only* source of information received by the officers that illegal activity was afoot, or that anyone was armed and dangerous. Thus, because the anonymous 911 call was insufficiently reliable, the officers seized and frisked Talley in the absence of reasonable suspicion and the fruits of those illegalities—including the firearm underlying this case— must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

36

Beyond erroneously deeming the tip adequate to provide reasonable suspicion, the district court's order erroneously suggests that Ornelas's interactions with the officers independently provided reasonable suspicion to seize and frisk Talley.  *See* 1-ER-20–21.  But Ornelas never mentioned any 911 call, a gun, or any illegal activity to the officers; and she communicated very little to them other than through gestures and mentioning "the man" in the parking lot.  While Ornelas no doubt directed the officers to the motel's rear parking lot, she never stated why she did so, and never once mentioned a gun or any other reason to believe a person in that parking lot had a gun or was otherwise engaged in criminal conduct.  *See* Ex. 18 at 1:07–1:25; Ex. 19 at 1:28–1:50.  Further, the officers' body-worn-camera footage indisputably shows that Ornelas was never within sight of the rear parking area.  *See id.*; *see also* 2-ER-145.  When Conway asked her for a description of the individual, she was not able to provide one.  *See id.* Ex. 19 at 1:40–1:45; 3-ER-274–75.  While Ornelas was distressed, her communications with the officers provided only information about the location of an otherwise undescribed "man," and they provided no information about why this man was of any concern.

Accordingly, not only was the anonymous 911 call insufficiently reliable to provide reasonable suspicion to detain or frisk, but Ornelas's mere directing of the officers to the rear parking lot also did not provide independent, particularized reasonable suspicion to detain or frisk anyone there.

D. The officers lacked reasonable suspicion to search Talley, an African-American man on the ground level, who did not match the suspect described by dispatch as a white male Latino on the second floor.

Even if that anonymous tip here was sufficiently reliable to provide reasonable suspicion that someone matching the description of the suspect contained therein possessed a gun, the Court must nevertheless reverse the district court's order in this case because Talley plainly did *not* match the description of the suspect broadcast by dispatch, and any reasonable suspicion dissipated before he was seized and frisked. This Court has held that reasonable suspicion that a suspect is armed and dangerous "must be individualized: '[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.'" *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990)); *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 (9th Cir. 2000) (en banc) ("Reasonable suspicion requires *particularized* suspicion, and in an area in which a large number of people share a specific characteristic, that characteristic casts too wide a net to play any part in a particularized reasonable suspicion determination." (emphasis in original)). In particular, this Court has emphasized as an "especially important" factor in "assessing the totality of the circumstances" is "whether the officer observes anything during an

encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed." *Thomas*, 818 F.3d at 877 (citations omitted).

Here, numerous discrepancies between the description of the suspect broadcast by dispatch and Talley dispelled any reasonable suspicion that it was Talley who possessed a gun or was dangerous. *See id.* First—and most strikingly—Talley did not match the ethnicity and skin tone of the suspect with a gun provided by dispatch. The suspect was described as a white Latino male. *See* Ex. 3-ER-428; Ex. 19 at 0:44–0:53. Talley is an African-American man with a medium to dark completion. *See, e.g.*, 3-ER-433. Further, the officers encountered two other suspects at the scene who more closely tracked the "white Latino" description of the suspect, both of whom were wearing black clothing.

Early on, Officers Conway and Silvestri both passed a man holding a cell phone in the front parking lot, and Conway asked Silvestri whether he was the suspect, with Conway later testifying that the man was Latino. *See* Ex. 19 at 0:28–0:32, 0:44–0:53; Ex. 17 at 0:34–0:37, 0:47–0:57; 2-ER-179–81. Likewise, the man on the second floor of the motel (that Hopkins detained and frisked) was also wearing black clothing, Hopkins characterized him as Latino (or alternatively as Black), and he was at the exact location of the suspect as described by dispatch: the second floor. *See id.* Ex. 17 at 1:58–2:02; Ex. 20 at 1:25–1:32.

Indeed, when Hopkins first pointed toward Talley in the rear parking lot, Silvestri responded, "That's not him," because Talley was not a white Latino male and did not match the description. *See* Ex. 17 at 1:58–2:02; 2-ER-195–96. After Talley was arrested, Silvestri repeatedly expressed his surprise that Talley had possessed a gun because he was Black, and the suspect was described as white Latino. *See* Ex. 17 at 4:12–4:20. Other officers agreed that Talley did not match the information provided by dispatch; whereas, the man on the motel's second floor more closely fit dispatch's description. *See* Ex. 18 at 7:47–7:59.

Second, Talley's location was at odds with the information provided by dispatch, which indicated that the suspect was on the second floor of the motel. *See* 3-ER-428; 3-ER-445; Ex. 20 at 1:04–1:06. Talley was in the ground-level parking lot on the Olive Street side of the building. *See* Ex. 19 at 1:58–2:02. There is no staircase, moreover, that allows access to that parking lot from the second floor of the motel, and arresting officers had to climb down the side of the building to access it. *See* 3-ER-441; 3-ER-445. Accordingly, given that there was a Latino male wearing black on the second floor who, by the officer's own admission, more closely matched the description of the suspect than Talley, and given Talley's location away from the second floor, these facts taken together undermined any reasonable suspicion that Talley was the armed suspect reported to 911. Thus, both Talley's race and skin tone, as well as his location, did not match the description of the suspect with a gun, and these critical factual

40

discrepancies dispelled any reasonable suspicion that Talley had a gun. *See, e.g., Thomas*, 818 F.3d at 877 ("Even where certain facts might support reasonable suspicion a suspect is armed and dangerous when viewed initially or in isolation, a frisk is not justified when additional or subsequent facts dispel or negate the suspicion."); *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) (holding that there was no reasonable suspicion to justify a frisk when the detained individual "did not match the description of either of the suspects").

Third, while Talley was wearing black clothing, he was not the only person wearing black on the scene at the time, including the man in the front parking lot, and the man on the second floor, as well as the man who left the parking lot and walked north on Polk Street. *See* Ex. 19 at 0:28–0:32 & Ex. 17 at 0:34-0:37 (man in front parking lot); Ex. 18 at 1:16–1:22 & Ex. 20 at 1:58–2:08 (man on second floor); Ex. 20 at 1:49–1:55 (man on Polk Street). Further, the description of a suspect wearing black clothing or all-black clothing is simply insufficiently specific to support reasonable suspicion, because it describes a very common sartorial choice in San Francisco. *Cf. Goodson v. Corpus Christi*, 202 F.3d 730, 737 (5th Cir. 2000) (lookout broadcast for "tall, heavy-set, white man dressed as a cowboy" did not give police "reasonable suspicion to stop and frisk any tall, heavy-set, white man" because in Texas "[s]uch a description would simply be too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion"); *see also J.L.*, 529 U.S. at 268 (holding that

anonymous tip describing a young Black male wearing a plaid shirt who possessed a gun did not provide reasonable suspicion to search defendant, even though he was a young Black male wearing a plaid shirt). Thus, the presence of many individuals in an area that match a description of a suspect means that an officer has less reasonable suspicion to search any one of them. *Cf. United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (finding reasonable suspicion when the "defendants were the only people in sight who matched the description of the robbers"). And merely "somewhat" matching a vague description like the one given here (listing only sex, race, build, and color of clothing), is insufficient to establish reasonable suspicion. *See Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) (finding no reasonable suspicion to stop individual who matched suspect description as "thin, black, and male" but who was wearing camouflage rather than brown jacket because description of suspect was too vague).

Fourth, the excited statements by Ornelas did not provide the officers with reasonable suspicion that Talley possessed a firearm, contrary to the district court's order. *See* 1-ER-20–21. Ornelas never mentioned a gun, any 911 call, illegal activity, or who "the man" was. *See* Ex. 19 at 1:19–1:50; Ex. 18 at 1:04–1:24. Nor did she lay eyes on Talley while the officers were present or positively identify him until *after* his arrest. *See id.*; 2-ER-145. Indeed, an anonymous 911 call reporting a person with a weapon, coupled with a non-specific identification by a bystander of a suspect by saying "that's him," does not support reasonable suspicion that the person

42

identified by the bystander has a weapon.  *See People v. Reyes*, 896 N.Y.S.2d 301, 303 (N.Y. App. Div. 2010) (finding no reasonable suspicion based on anonymous 911 call describing a suspect with a knife, when officers then encountered two unknown men who "pointed out defendant without accusing him of any specific acts"); *id.* at 304 ("In this case, the store owners' direction of the officers' attention to the suspect without relating it to any specific event did not provide a basis for the officers' reasonable suspicion.").  And here, unlike in *Reyes*, the housekeeper did not positively identify Talley in the officers' presence prior to his detention, further reducing the reasonableness of any suspicion the officers had that Talley had a gun.  *Cf. id.*

Simply put, an anonymous tip reporting a person with a weapon coupled with a basic description of that person's appearance does not amount to reasonable suspicion to seize or frisk a person who matches that description, *see J.L.*, 529 U.S. at 268, 271–72, let alone a person does *not* match the description, as occurred here.  Accordingly, even if the anonymous 911 call had sufficient indicia of reliability to give rise to reasonable suspicion that someone possessed a gun, any suspicion that *Talley* was the man with the gun was dispelled by the time officers seized and frisked him given the serious discrepancies between Talley and the description of the suspect broadcast by dispatch.

43

## CONCLUSION

For the foregoing reasons, this Court should vacate Talley's judgment of conviction, reverse the district court's order, and remand with instructions to grant Talley's motion to suppress.

Respectfully submitted,

JODI LINKER
Federal Public Defender

August 7, 2023

s/Todd M. Borden

TODD M. BORDEN
DANIEL P. BLANK
Assistant Federal Public Defenders

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any pending case presenting an issue related to those raised in this brief.

|  | Respectfully submitted, |
|---|---|
|  | JODI LINKER |
|  | Federal Public Defender |
| August 7, 2023 | s/Todd M. Borden |
|  | TODD M. BORDEN |
|  | DANIEL P. BLANK |
|  | Assistant Federal Public Defenders |

45

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-10019

I am the attorney or self-represented party.

**This brief contains** | 10,840 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Todd M. Borden | **Date** | 8/7/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*